

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-6-2008

# Lebanon Farms v. Lebanon

Precedential or Non-Precedential: Precedential

Docket No. 06-3473

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Lebanon Farms v. Lebanon" (2008). *2008 Decisions.* Paper 599.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/599

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 06-3473 and 06-3474

———

LEBANON FARMS DISPOSAL, INC.

v.

COUNTY OF LEBANON;
GREATER LEBANON REFUSE AUTHORITY


County of Lebanon,
Appellant No. 06-3473


Greater Lebanon Refuse Authority,
Appellant No. 06-3474

———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 03-cv-006820)
District Judge:  The Honorable Yvette Kane

———

Argued June 3, 2008

Before:  FISHER and JORDAN, *Circuit Judges,*
and YOHN,[*] *District Judge.*

(Filed: August 6, 2008)

Stephanie E. DiVittore
Charles E. Gutshall (Argued)
Rhoads & Sinon
One South Market Square
P.O. Box 1146, 12th Floor
Harrisburg, PA  17108
	*Attorneys for Appellee*

James J. Kutz (Argued)
Paula J. McDermott
Post & Schell
17 North 2nd Street
12th Floor
Harrisburg, PA  17101

David L. Schwalm
Thomas, Thomas & Hafer
305 North Front Street
P.O. Box 999
Harrisburg, PA  17108
	*Attorneys for Appellants*

---

[*]The Honorable William H. Yohn Jr., United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

2

## OPINION OF THE COURT

YOHN, *District Judge*.

The County of Lebanon ("County") and the Greater Lebanon Refuse Authority ("GLRA")[1] appeal the District Court's July 5, 2006 decision granting plaintiff Lebanon Farms Disposal, Inc.'s ("Lebanon Farms") motion for partial summary judgment. Applying a strict scrutiny standard, the District Court held that the County's Municipal Waste Management Ordinance No. 15 and Sections V and X(3) of the GLRA's July 5, 2005 Regulations (collectively, "flow control ordinances") that benefitted the GLRA's public waste disposal site violated the dormant Commerce Clause of the United States Constitution. The District Court therefore permanently enjoined the County and the GLRA from enforcing the flow control ordinances. While the County and the GLRA's appeal of that decision was pending, the Supreme Court decided *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Management Authority*, ___ U.S. ___, 127 S. Ct. 1786 (2007). In Part II.C of *United Haulers*, a majority of the Court held that the "virtually *per se* rule of invalidity" that applies to flow control ordinances that benefit

---

[1]The GLRA is a municipal authority created under and authorized by the Pennsylvania Municipalities Act, 53 Pa. Cons. Stat. §§ 5601 *et seq.* It is comprised of representatives of twenty-five municipalities in the County.

private entities and that "can only be overcome by a showing that the State has no other means to advance a legitimate local purpose" does not apply to challenges of nondiscriminatory flow control ordinances that benefit public waste disposal facilities. *Id.* at 1793, 1797. In Part II.D, a plurality of the Court instructed lower federal courts to perform the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), when considering dormant Commerce Clause challenges to nondiscriminatory flow control ordinances that benefit public facilities with only incidental effects on interstate commerce. *United Haulers*, 127 S. Ct. at 1797. *United Haulers* controls this case and requires us to vacate the District Court's grant of partial summary judgment and the resulting permanent injunction. Because the District Court should make necessary findings of fact and conclusions of law and perform the *Pike* balancing test in the first instance, we will remand.

## I.

In 1988, the Pennsylvania General Assembly adopted the Municipal Waste Planning, Recycling and Waste Reduction Act, 53 Pa. Cons. Stat. § 4000.101 *et seq.* ("Act 101"). Act 101 charges counties with the responsibility for planning and coordinating municipal waste disposal and ensuring adequate landfill capacity through recurring ten-year planning processes. The County complied with Act 101 by adopting the 1990 Municipal Waste Management Plan ("1990 Plan"). As a result of a detailed study, the 1990 Plan recommended that the County continue municipal waste disposal at a GLRA-owned and GLRA-run landfill, various portions of which had been used by the GLRA since its formation in 1959. The 1990 Plan also

4

recommended that the County enact a waste management ordinance, including a waste flow control plan.[2]

The County adopted Ordinance 15 on June 6, 1991. Ordinance 15 implements the 1990 Plan and grants the GLRA authority to control the County's waste management. Sections 2 and 3 of Ordinance 15 establish a licensing and waste flow control scheme regulating the collection and transport of all municipal waste generated within the county. Section 2(a) requires that any waste collectors within the County obtain a license from the GLRA. Both in-state and out-of-state private haulers may obtain a license and collect waste in the County, subject to a uniform "tipping fee."[3] The waste flow control provisions of Section 3 require the licensed collectors to deliver

---

[2]Throughout this opinion, we employ the term "waste" to refer to the "municipal waste" covered by the relevant plans and ordinances and as defined in Act 101, 53 Pa Cons. Stat. § 4000.103.

[3]Tipping fees are disposal charges levied against collectors who drop off waste at a processing facility. "They are called 'tipping' fees because garbage trucks literally tip their back end to dump out the carried waste." *United Haulers*, 127 S. Ct. at 1791 n.1. During the period relevant to this case, the GLRA set the tipping fee at $62.70 per ton, including a $15.00 per ton surcharge covering recycling programs, administration and enforcement costs, and costs for maintaining environmentally safe closed landfills.

5

the waste to a "Designated Facility"[4] unless "permitted by rule, regulation, ordinance, or order duly issued by the [GLRA]."[5] Various provisions of Ordinance 15 authorize the GLRA to adopt rules and regulations, to issue and revoke licenses and collect license fees, to identify designated facilities, to set system tipping fees, to establish penalties for violations, to enforce penalties, and to perform other governing and administrative tasks.

---

[4]Section 1 of Ordinance 15 defines a Designated Facility: "Any municipal waste storage, collection, transfer, processing, or disposal facility or site constructed, owned, or operated by or on behalf of the [GLRA]."

[5]Section 3 of Ordinance 15, titled "Waste Flow Control," provides:

(a) Delivery to Designated Facility. Except as provided in (b) and (c) below, all Regulated Municipal Waste shall be delivered to a Designated Facility.

(b) Delivery to Other Sites. Delivery of Regulated Municipal Waste to other sites pursuant to the Plan may occur only as permitted by rule, regulation, ordinance, or order duly issued by the [GLRA].

(c) Recycling. Nothing herein shall be deemed to prohibit Source Separation or Recycling or to affect any sites at which Source Separation or Recycling may take place.

6

Pursuant to Act 101's ten-year-review protocol, the County amended the 1990 Plan with the 2000-2010 Lebanon County Municipal Waste Management Plan ("2000 Plan"). Both the 1990 Plan and the 2000 Plan were submitted to and approved by the County Advisory Committee, subjected to public review, ratified by the municipalities in the County, and submitted to and approved by the Pennsylvania Department of Environment Protection ("DEP").[6] The 2000 Plan discusses the desirability of continued waste flow control to ensure adequate processing and disposal capacity; to maintain sufficient revenue to cover the costs of planning, implementation, administration, recycling support, landfill monitoring, and enforcement; and to ensure proper disposal of municipal waste, including recycling mandates. The 2000 Plan also permits the GLRA to approve interstate waste shipments after it reviews the out-of-state receiving facilities.[7]

---

[6]The 1990 Plan was submitted to the DEP's precursor, the Department of Environmental Resources ("DER"). Prior to 1995, the DER was charged with implementing Act 101. In 1995, the DER was renamed the DEP. 71 Pa. Stat. Ann. § 1340.501. The DEP was charged with continuing the duties of the DER, unless otherwise specified by legislation. *Id.* § 1340.503. The DEP's Environmental Quality Board thus became responsible for the powers and duties specified in Act 101. *Id.* § 1340.502(c).

[7]Under the new waste flow control system,

   [a]ny out-of-state disposal facility, or hauler, applying for contractual approval to

Pursuant to the authority granted to it by Ordinance 15,[8] the GLRA adopted regulations governing waste disposal in the County, most recently amending them on July 5, 2005. Section V of the July 5, 2005 Regulations designates one facility for municipal waste disposal—the GLRA-owned landfill.[9] The

> dispose of Lebanon County municipal waste at an out-of-state facility will be required to provide the same capacity assurance to the County which the GLRA has provided and thereby reduce the capacity assurance which the GLRA has provided the County for the remainder of the assured term. The out-of-state facility will also be required to pay their [sic] fair share of recycling, enforcement, administrative, and environmental mitigation costs which would otherwise be paid by the generators as part of the GLRA tipping fee.

The District Court found that after the County adopted the 2000 Plan, it did not amend Ordinance 15 to make this specific provision for out-of-state transportation of County waste. The District Court, therefore, did not consider the 2000 Plan in its decision.

[8]On September 17, 1998, the County and the GLRA entered into a formal agreement memorializing the authority of the GLRA.

[9]Section V specifies:

> The [GLRA] Landfill is the designated site for disposal of municipal waste and

8

Regulations allow a collector to deliver waste to another point of delivery with the GLRA's prior written approval. Under Section X(3) of the Regulations, the GLRA can impose penalties for noncompliant transport of municipal waste to another site, including a fine of $2000 per occurrence.[10]

---

> construction/demolition waste generated in Lebanon County by the [2000 Plan]. All Regulated Municipal Waste collected by a commercial waste service, shall be transported directly from the point of collection to the GLRA facility or other approved point of delivery in accordance with these Rules and Regulations. Any intervening transfer, unloading, processing, sorting, salvaging, scavenging or reuse is prohibited.

[10]Section X(3), titled "Diversion of Regulated Municipal Waste (from County Plan Designated Facility)," provides:

> For Regulated Municipal Waste . . . originating in Lebanon County, which is transported to any location other than a GLRA Facility without the prior written approval of the GLRA, a penalty will be charged to the company and/ or Person operating the vehicle. . . .
> The penalty for any hauler who diverts municipal waste from the Designated Facility, the [GLRA] Landfill, is established at $2,000.00 per occurrence. . . .
> The penalty will be invoked immediately

In 2003, under a GLRA-issued license, Lebanon Farms hauled waste generated in the County. Twice, on March 18, 2003 and April 3, 2003, the GLRA fined Lebanon Farms for transporting County municipal waste out of the County to the Pine Grove Landfill in Schuylkill County. At the Pine Grove Landfill, Lebanon Farms's drivers misrepresented the origin of the waste loads as Berks County. Lebanon Farms did not request approval to haul waste to a site other than the GLRA landfill.[11]

On April 23, 2003, Lebanon Farms brought this suit to challenge the flow control ordinances. The Complaint alleged, inter alia, that the ordinances violate the dormant Commerce

---

after it can be shown that Lebanon County Municipal Waste was diverted from the approved GLRA facility.

[11]At oral argument, appellants stated that only one nonparty waste hauler had ever applied for an exception under Section 3(b) of Ordinance 15 to transport waste to an alternative facility. The GLRA granted the exception, but the hauler did not exercise its option. Lebanon Farms admitted that it had not applied for exceptions for the waste loads that led to the fines against it. On remand, the District Court may want to make relevant findings of fact as to the ability of waste haulers to apply for and receive exceptions authorizing them to haul waste to non-GLRA landfills because such a process, if it affords a realistic opportunity for success, reduces the burden on interstate commerce for the purpose of applying the *Pike* balancing test.

10

Clause. In Count I, Lebanon Farms sought an injunction prohibiting the County and the GLRA from enforcing the ordinances, and it sought damages in Count II. Counts III, IV, V, and VI alleged, respectively, a violation of procedural due process; retaliation; a pendant state law claim for violation of Act 90 of 2002, 27 Pa. Cons. Stat. § 6201 *et seq.*; and a pendant state law claim for an invalid monetary penalty assessment.[12] On July 28, 2004, the GLRA counterclaimed for breach of the licensing agreement and associated damages.

On July 5, 2006, the District Court granted partial summary judgment in favor of Lebanon Farms and against the County and the GLRA on Count I.[13] In light of *C&A Carbone*

---

[12]On July 9, 2004, the District Court dismissed Count V, the pendant state-law claim for violation of Act 90. The contemporaneous memorandum also indicated that plaintiff withdrew Count III, the procedural due process claim, and Count VI, the pendant state-law claim for invalid monetary penalty assessment. (*See* July 9, 2004 Mem. & Order 2 n.1) Lebanon Farms's withdrawal of Count VI is inconsistent, however, with the County's and the GLRA's later motions for summary judgment on Count VI. On July 5, 2006, the District Court denied those requests as part of its denial of the unaddressed remainder of the defendants' motions.

[13]The District Court also granted the motions for summary judgment of the County and the GLRA as to Count IV, which was Lebanon Farm's retaliation claim. Only the partial summary judgment on Count I is at issue in this appeal.

*v. Town of Clarkstown*, 511 U.S. 383 (1994) and *Harvey & Harvey, Inc. v. County of Chester*, 68 F.3d 788 (3d Cir. 1995), the District Court held that waste disposal is part of interstate commerce, that the flow control ordinances discriminated against interstate commerce, and that the ordinances failed the then-applicable strict scrutiny standard for constitutionality.

In *Carbone*, the Supreme Court considered a flow control ordinance that directed all of a town's nonhazardous solid waste to a privately owned waste transfer station. 511 U.S. at 387. The Court stated that "[d]iscrimination against interstate commerce in favor of local business or investment is per se invalid, save in a narrow class of cases in which the municipality can demonstrate, *under rigorous scrutiny, that it has no other means to advance a legitimate local interest.*" *Id.* at 392 (emphasis added). Under that standard, the Court held that the ordinance discriminated against interstate commerce by "hoard[ing] solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility." *Id.*

This court applied *Carbone* in *Harvey* by "focus[ing] on the process of selecting waste service providers rather than on the effect of the regulation once a provider or providers have been chosen." 68 F.3d at 802 (citing *Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl. County*, 48 F.3d 701, 713 (3d Cir. 1995)). The court considered the flow control regulations of Chester and Mercer Counties, Pennsylvania. *Id.* at 791. The Chester County regulations designated county-owned and privately owned in-state waste disposal facilities, although they capped waste flows to the private landfill. *Id.* at 794-95. The Mercer County regulations

12

designated a single, private, in-state waste disposal facility for all waste flows. *Id.* at 796. We instructed:

> To determine whether these flow control schemes actually discriminate against interstate commerce (triggering strict scrutiny analysis) the court must closely examine, for signs that out-of-state bidders do not in practice enjoy equal access to the local market, the following: (1) the designation process; (2) the duration of the designation; and (3) the likelihood of an amendment to add alternative sites.

*Id.* at 801. Applying these criteria to the Chester County regulations, the court noted that "it appears that Chester County's designation process for the ten-year planning period did not afford other sites, including out-of-state sites, a level playing field," but remanded to allow the district court to apply the principles in the first instance. *Id.* at 807. The court in particular focused on the protectionist impact of the county's financial interests because of its ownership of one of the waste disposal sites and its guarantee of debt secured by the waste authority on another site. *Id.* at 806-07. With regard to the Mercer County regulations, the court held that the "facts certainly suggest that the process was fair, open, and competitive" for the ten-year planning period, but that on remand the district court should consider if the "specifications of the bid or decisional criteria" had a "discriminatory effect." *Id.* at 808.

13

The District Court in the case below applied *Harvey*'s three-part test to conclude that the County and the GLRA discriminated against interstate commerce. It found that the closed designation process, the long duration of the designation, and the unlikelihood of amendment all evidenced discrimination against interstate commerce. Based on these determinations and pursuant to the then-prevailing authority of *Harvey*, the District Court applied a strict scrutiny standard of review to the flow control ordinances and rejected the County and the GLRA's request that the court apply the alternative, fact-intensive *Pike* balancing test reserved for nondiscriminatory laws directed at local concerns with incidental effects on interstate commerce. As a result, the District Court declared the flow control ordinances unconstitutional because they violated the dormant Commerce Clause and permanently enjoined the County and the GLRA from enforcing those ordinances. The District Court refrained from entering a final judgment, however, because genuine issues of material fact remained regarding the imposition of the monetary damages requested in Count II. The County and the GLRA appealed the entry of partial summary judgment on July 27, 2006, and on September 5, 2006, the District Court stayed the request for monetary damages pending the outcome of defendants' appeal.

On September 13, 2007, a separate panel of this court ordered briefing regarding the impact of the Supreme Court's intervening decision in *United Haulers* and, in particular, the

14

significance, if any, of the plurality's application of the balancing test set forth in *Pike*.[14]

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. We have jurisdiction under 28 U.S.C. § 1292, which provides for review of the District Court's interlocutory order granting an injunction. We engage in plenary review of the District Court's grant of summary judgment. *See, e.g., Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007). When reviewing final injunction orders, we "must accept the trial court's findings of historical or narrative fact unless they are clearly erroneous, . . . but we must exercise a plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers v. Mack Trucks, Inc.*, 820 F.2d 91, 95 (3d Cir. 1987) (quoting *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 103 (3d Cir. 1981)). In

---

[14]After *United Haulers* was decided on April 20, 2007, appellants filed a motion for summary action pursuant to Third Circuit Local Appellate Rule 27.4 asking the court to vacate the injunction and remand to the District Court with instructions to decide the case in light of the *United Haulers* decision. Appellee filed a response, and, on September 13, 2007, the panel denied the motion for summary action and ordered the parties to file briefs discussing the impact of the *United Haulers* decision.

15

contrast, we apply an abuse of discretion standard to the District Court's decision to grant an injunction. *See id.* at 94-95. Because the issue before us is whether an intervening decision of the Supreme Court superceded the District Court's application of pre-existing law, not the District Court's findings of facts, plenary review is appropriate here.

### III.

The intervening Supreme Court decision in *United Haulers* controls the resolution of this appeal. For Parts I and II.A-C of *United Haulers*, Chief Justice Roberts authored a majority opinion joined by Justices Scalia, Souter, Ginsburg, and Breyer. 127 S. Ct. at 1789-90. Part II.D of Chief Justice Roberts's opinion was joined by Justices Souter, Ginsburg, and Breyer, making it a four-Justice plurality opinion. *Id.* The plurality held that the *Pike* balancing test applies to waste flow regulations benefitting public entities with incidental effects on interstate commerce. *Id.* at 1797. Justice Scalia did not join Part II.D, but concurred in the judgment. *Id.* at 1798-99. Justice Thomas also concurred in judgment, but did not join any part of Chief Justice Roberts's opinion. *Id.* at 1799-1802. Both Justices Scalia and Thomas issued concurring opinions, concluding for differing reasons that the dormant Commerce Clause did not apply to the case, so the flow control ordinances should be beyond the scrutiny of the courts altogether. *Id.* at 1798-99 (Scalia, J., concurring in part) (concurring that the dormant Commerce Clause does not apply to a flow control ordinance that "benefits a *public entity* performing a traditional local-government function and treats *all private entities* precisely the same way," but refusing to join the plurality's

16

application of *Pike* because "the balancing of various values is left to Congress"); *id.* at 1799 (Thomas, J., concurring in judgment) (concurring in judgment only because the dormant Commerce Clause "has no basis in the Constitution and has proved unworkable in practice"). Because under the reasoning of their concurring opinions Justices Scalia and Thomas would agree that a flow control ordinance that passes the *Pike* balancing test is constitutional, the plurality's conclusion in Part II.D is both the narrowest of the opinions and the common denominator of the Court's resulting decision, thus representing the holding of the Court. *See Marks v. United States*, 430 U.S. 188, 193 (1977); *Anker Energy Corp. v. Consolidation Coal Co.*, 177 F.3d 161, 170-71 (3d Cir. 1999); *Rappa v. New Castle County*, 18 F.3d 1043, 1056-60 (3d Cir. 1994); *Planned Parenthood of Se. Pa. v. Casey*, 947 F.2d 682, 694 n.7 (3d Cir. 1991) (holding that "[w]hen six or more Justices join in the judgment and they issue three or more opinions," the holding of the Court is the "opinion of the Justice or Justices who concurred on the narrowest grounds *necessary to secure a majority*"*), modified on other grounds,* 505 U.S. 833 (1992); *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (holding that the determinative question is whether the other concurring Justices would subscribe to or agree with the reasoning of the narrower concurring opinion) (citing *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976); *Marks*, 430 U.S. at 193)). The parties do not dispute that the plurality's opinion in Part II.D is the holding of the Court for that Part.[15]

---

[15]The plurality's opinion in Part II.D also conforms to existing precedent. The majority concluded in Part II.C that the

*United Haulers* recognized that there are two ways to violate the dormant Commerce Clause: (1) facial discrimination against interstate commerce, *see United Haulers*, 127 S. Ct. at 1793 (holding that "[i]n this context, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter" (internal quotation marks omitted)); and (2) where "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits," *id.* at 1797 (internal quotation marks omitted); *see also Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 440 (1978); *Pike*, 397 U.S. at 142. *See generally Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 99 (1994) (explaining the two ways to identify a violation of the dormant Commerce Clause).

## A.

The Court's majority opinion in Part II.C of *United Haulers* removes this case from the facial discrimination category of dormant Commerce Clause violations. *United Haulers* held that flow control ordinances that benefit a "clearly

waste flow controls benefitting public entities without treating private entities differently are not discriminatory. Under prior dormant Commerce Clause case law, nondiscriminatory regulations directed to legitimate local concerns with incidental effects on interstate commerce should be analyzed using the *Pike* balancing test. *See, e.g.*, *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978). *But see United Haulers*, 127 S. Ct. at 1798-99 (Scalia, J., concurring in part).

public facility" and "which treat in-state private business interests exactly the same as out-of-state ones, do not 'discriminate against interstate commerce' for purposes of the dormant Commerce Clause." 127 S. Ct. at 1795, 1797. The *United Haulers* majority distinguished *Carbone*'s rigorous scrutiny analysis as applying only to regulations that favor private waste disposal sites, *see* 127 S. Ct. at 1795, thus overruling *Harvey* to the extent it supports the application of strict scrutiny to publicly operated waste disposal sites like the GLRA site, *see* 68 F.3d at 806-07.[16] The Court in *United Haulers* explained that "[c]ompelling reasons justify treating these laws differently from laws favoring particular private

_____

[16]An intervening decision of the Supreme Court is a sufficient basis for us to overrule a prior panel's opinion without referring the case for an en banc decision. *See Mennen Co. v. Atl. Mut. Ins. Co.*, 147 F.3d 287, 294 n.9 (3d Cir. 1998) (holding that the internal procedure prohibiting "a panel of this court from overruling a holding of a prior panel expressed in a published opinion" nonetheless "gives way when the prior panel's holding is in conflict with Supreme Court precedent") (citing *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 266 n.6 (3d Cir. 1995), and *Rubin v. Buckman*, 777 F.2d 71, 73-74 (3d Cir. 1984) (Garth, J., concurring)); *Reich v. D.M. Sabia Co.*, 90 F.3d 854, 858 (3d Cir. 1996) (holding that "[a]lthough a panel of this court is bound by, and lacks authority to overrule, a published decision of a prior panel, . . . a panel may reevaluate a precedent in light of intervening authority" (internal cross-reference omitted)).

19

businesses over their competitors." 127 S. Ct. at 1795.[17]
Lebanon Farms concedes that the flow control ordinances in this
case benefit a public waste disposal site and treat in-state private
businesses exactly the same as out-of-state ones. Thus, in light
of *United Haulers* Part II.C,[18] we must vacate the District

---

[17]The most compelling reason is that state and local
governments, unlike private businesses, are responsible for "the
health, safety, and welfare of [their] citizens." *United Haulers*,
127 S. Ct. at 1789 (citing *Metro. Life Ins. Co. v. Massachusetts*,
471 U.S. 724, 756 (1985) (holding that "[s]tates traditionally
have had great latitude under their police powers to legislate as
to the protection of the lives, limbs, health, comfort, and quiet
of all persons" (internal quotation marks omitted from original)).

[18]This case seems indistinguishable from *United Haulers*
in all material ways for the purpose of the facial discrimination
analysis conducted by the Court in Part II.C. As in *United
Haulers*, the flow control ordinances in this case clearly benefit
a public facility, the GLRA. Similarly, the flow control policies
"enable the Count[y] to pursue particular policies with respect
to the handling and treatment of waste generated in the
Count[y], while allocating the costs of those policies on citizens
and businesses according to the volume of waste they generate,"
127 S. Ct. at 1796. This case also implicates the decision of
local voters, or their elected officials, "on whether government
or the private sector should provide waste management
services," 127 S. Ct. at 1796. Finally, "the most palpable harm
imposed by the ordinances—more expensive trash removal—is
likely to fall upon the very people who voted for the laws,"

20

Court's grant of partial summary judgment, declaration that the ordinances were unconstitutional, and issuance of a permanent injunction against their enforcement, which were based on our *Harvey* precedent.[19]  Our analysis does not end there, however.

**B.**

"Concluding that a state law does not amount to forbidden discrimination against interstate commerce is not the death knell of all dormant Commerce Clause challenges, for we generally leave the courtroom door open to plaintiffs invoking the rule in *Pike*, that even nondiscriminatory burdens on commerce may be struck down on a showing that those burdens

---

through higher than expected tipping fees which are passed on to the consumer, 127 S. Ct. at 1797.  As with *United Haulers*, "[t]here is no reason to step in and hand local businesses a victory they could not obtain through the political process," *id.*

[19]As noted above, in granting partial summary judgment, the District Court relied on our decision in *Harvey*, which in part applied to publicly owned waste disposal sites the rigorous scrutiny review that the Supreme Court applied in *Carbone*. *See* 68 F.3d at 806-07.  *United Haulers* squarely raised the issue left open by *Carbone*—whether rigorous scrutiny applies to publicly owned waste disposal sites—an issue that *Harvey* implicitly answered in the affirmative.  *Harvey*'s application has now been overruled to the extent it suggests the application of strict scrutiny to nondiscriminatory regulations benefitting public waste disposal sites.

21

clearly outweigh the benefits of a state or local practice." *Dep't of Revenue of Ky. v. Davis*, ___ U.S. ___, 128 S. Ct. 1801, 1817 (2008). The *United Haulers* plurality in Part II.D concluded that nondiscriminatory "flow control ordinances are properly analyzed under the test set forth in *Pike* . . ., which is reserved for laws directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." 127 S. Ct. at 1797 (internal quotation marks and citations omitted). Using the *Pike* test, a court will "uphold a nondiscriminatory statute like this one unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Id.* (internal quotation marks and citations omitted).

The flexible *Pike* balancing test thus weighs the extent of the incidental burden on interstate commerce against the putative local benefits:

> If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike*, 397 U.S. at 142. The *Pike* balancing is carried out in light of our hesitation to interfere in internal policy decisions traditionally vested with local governments. For example, federal courts hold sacrosanct "state legislation in the field of safety where the propriety of local regulation has long been recognized." *Pike*, 397 U.S. at 143.

22

## C.

In this case, although the parties agree that *United Haulers* controls the outcome of this appeal, they disagree about the appropriate disposition. The County and the GLRA argue that (1) *United Haulers* mandates a per se finding that the flow control ordinances do not violate the dormant Commerce Clause, and (2) the ordinances pass the *Pike* balancing test because they are indistinguishable from the ordinances considered in *United Haulers*.[20] Lebanon Farms argues that

[20]Appellants argue that while four Justices applied *Pike* in Part II.D of *United Haulers*, six Justices agreed with Part II.C that waste flow control ordinances benefitting public disposal sites do not discriminate against interstate commerce for the purposes of the dormant Commerce Clause. They thus contend that those six Justices align in favor of the use of a "low-standard form of *Pike* balancing which will always result in upholding the flow control ordinances" or that the GLRA is not subject to dormant Commerce Clause litigation at all. (*See* Appellants' Br. 37, 37 n.9, 39.) This argument is flawed. As discussed above, the four-Justice plurality in Part II.D represents the holding of the Court and dictates the application of the *Pike* balancing test to flow control ordinances that benefit a public facility like the GLRA-owned waste disposal site. The majority in Part II.C determined that such ordinances do not constitute facial discrimination, but did not cut short the necessity to apply the *Pike* balancing test to such ordinances to ensure that the incidental effects on interstate commerce do not outweigh the legitimate local concerns. To hold otherwise would render the

applying the *Pike* balancing test instead of strict scrutiny yields the same result as the District Court's strict scrutiny review—the

---

broader concurrences of Justices Scalia and Thomas, which did not garner the support of the narrower four-Justice plurality, the effective holding of the Court for Part II.D, contravening well-established interpretive guidance. *See*, *e.g.*, *Marks*, 430 U.S. at 193 (holding that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds" (internal quotation marks omitted)). Nor does Part II.C or the concurrences of Justices Scalia and Thomas dictate the application of a "low-standard" *Pike* test; such a test simply does not exist.

Appellants also ask us to end our analysis with the conclusion that this case is on "all fours, factually and legally," with *United Haulers* and issue a final ruling on that basis. (Appellants' Br. at 27, 37, 38.) We will not do so because, as both parties acknowledged at oral argument, we do not have sufficient findings of fact and conclusions of law by the District Court to determine whether this case is squarely on par with *United Haulers*.

24

ordinances still violate the dormant Commerce Clause.[21]  Thus, both parties ask us to apply the *Pike* balancing test.

Considering the strong language of the Supreme Court's holding in *United Haulers*, which found "it unnecessary to decide whether the ordinances impose any incidental burden on interstate commerce because any arguable burden does not exceed the public benefits of the ordinances," 127 S. Ct. at 1797, we perhaps could conduct the balancing test on the record as it exists and even conclude that any incidental burden on interstate commerce does or does not exceed the public benefits of the presently considered ordinances.  We will not do so, however.  We find the Second Circuit's opinion in *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Management*, 261 F.3d 245 (2d Cir. 2001), to be particularly instructive.  The Second Circuit correctly predicted the Supreme Court's eventual holding that "[f]low control regulations like the Oneida-Herkimer ordinances, which negatively impact all

_____

[21]Similar to the waste haulers in *United Haulers*, appellee invites us to "rigorously scrutinize economic legislation passed under the auspices of the police power," 127 S. Ct. at 1798. (*See* Appellee's Br. 32-44 (arguing that the regulations were not "necessary" to achieve the County's goals).)  "There was a time when th[e courts] presumed to make such binding judgments for society, under the guise of interpreting the Due Process Clause. . . . We should not seek to reclaim that ground for judicial supremacy under the banner of the dormant Commerce Clause." *United Haulers*, 127 S. Ct. at 1798 (citing *Lochner v. New York*, 198 U.S. 45 (1905)).

private businesses alike, regardless of whether in-state or out-of-state, in favor of a publicly owned facility, are not discriminatory under the dormant Commerce Clause." *Id.* at 263. It then "admit[ted] a temptation to undertake the *Pike* balancing test in the first instance, . . . [a] temptation[, which] . . . arises from the well-settled principle that waste disposal is a traditional local government function." *Id.* at 263-64. The court nonetheless decided to "resist the temptation to rule as a matter of law prior to adequate discovery and further argument by the parties, which will undoubtedly assist the District Court in this fact-intensive determination." *Id.* at 263-64. It concluded:

> We . . . hold . . . that although it does not, in and of itself, give a municipality free reign to place burdens on the free flow of commerce between the states, the fact that a municipality is acting within its traditional purview must factor into the District Court's determination of whether the local interests are substantially outweighed by the burdens on interstate commerce. With that understanding, we reverse and remand for a determination of whether the Counties' flow control laws pass constitutional muster under the *Pike* balancing test.

*Id.* at 264. Only after the district court conducted the *Pike* balancing test and the Second Circuit affirmed did the Supreme Court's plurality in Part II.D affirm the application of the test. *See United Haulers*, 127 S. Ct. at 1797-98.

We will follow the approach of the Second Circuit. We will remand to the District Court to conduct the *Pike* balancing test and make findings of fact and conclusions of law for the record. In its present form, the record is incomplete regarding the burden on interstate commerce and, more importantly, the putative local benefits. Because the District Court did not have the benefit of the Supreme Court's decision in *United Haulers* and because we do not have the benefit of the District Court's findings of fact and conclusions of law under the now relevant standard, we will remand with instructions to apply the *Pike* balancing test in accordance with Part II.D of *United Haulers*. After development of a proper factual record, this court will be in a better position to review the District Court's factual and legal conclusions, if asked.

## IV.

Under the majority's holding in Part II.C of *United Haulers*, we will vacate the District Court's judgment in favor of appellee on Count I of the Complaint, the declaration that the flow control ordinances are unconstitutional, and the grant of a permanent injunction against their enforcement. We will remand to the District Court with instructions to apply the *Pike* balancing test in light of the plurality's opinion in Part II.D of *United Haulers*. The District Court should make the findings of fact and conclusions of law necessary to consider Count I under the *Pike* standard and, if necessary, any other remaining issues in the action.

27