**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4018
_____

PIONEER AGGREGATES, INC.; THE FAMOUS BRANDS, INC., dba Simpson
Solutions,

Appellants

v.

THE PENNSYLVANIA DEPARTMENT OF  ENVIRONMENTAL PROTECTION;
JOHN HANGER, in his individual and official capacity;
KEITH BRADY, in his individual and official capacity; THOMAS CALLAHAN, in his
individual and official capacity;
NATHAN HOUTZ, in his individual and official capacity; MICHAEL MENGHINI, in
his individual and official capacity;
MICHAEL KUTNEY, in his individual and official capacity
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(No. 3-11-cv-00325)
District Judge:  Hon. Robert D. Mariani

Submitted Pursuant to Third Circuit LAR 34.1(a)
June 27, 2013

Before:  FUENTES, FISHER, and CHAGARES, <u>Circuit Judges</u>.

(Filed: August 30, 2013)
_____

OPINION
_____

CHAGARES, Circuit Judge.

Pioneer Aggregates, Inc. ("Pioneer") and Simpson Solutions ("Simpson") filed a lawsuit against the Pennsylvania Department of Environmental Protection ("PADEP") and individual defendants (collectively, the "defendants") for the alleged violation of various constitutional rights that Pioneer and Simpson claim to have suffered when the defendants denied their request to use out-of-state clean-fill material to reclaim Pioneer's active mines in Pennsylvania. For the reasons articulated below, we will affirm.

I.

Pioneer is a mining company that owns and operates a non-coal quarry in Laflin, Pennsylvania (the "Laflin Quarry"). Pioneer joined with Simpson, a New Jersey company, to reclaim Pioneer's Laflin Quarry by disposing of clean fill there. Fill is "clean" if it is composed of materials designated permissible and falls at or below specified contaminant levels. Pioneer and Simpson's deal involved identifying, securing, and transporting fill to Pioneer's Pennsylvania mines for disposal. In order to use the fill to reclaim the Laflin Quarry, Pioneer requested that the defendants revise Pioneer's mining permit to allow for the use of clean fill for reclamation. The Bureau of District Mining Operations (the "Mining Bureau"), a division of the office of Active and Abandoned Mine Operations, granted the revised permit on the condition that Pioneer satisfy existing clean-fill guidelines.

Pioneer and Simpson (collectively, the "plaintiffs") claim that the Bureau of Waste Management (the "Waste Bureau") "directs and administers the statewide waste programs," promulgating the Solid Waste Management Act (the "Waste Act") and

2

regulations relating to disposal of fill. Pioneer Br. 12. The plaintiffs argue before this Court, as they alleged in their Complaint, that it is the Waste Bureau that "has authority to control the properties of fill material and its use" under the Waste Act. Appendix ("App.") 21. However, the plaintiffs contend, the Mining Bureau "circumvented [its] lack of authority by drafting and imposing [its] own clean fill standard for active mine reclamation." Pioneer Br. 11.[1] This standard (the "Mining Standard") bears some similarity to the standard promulgated by the Waste Bureau (the "Waste Standard") but, the plaintiffs claim, the Mining Standard's requirements are more stringent. Specifically, under the Mining Standard, incidental mine reclamation clean fill, which is 750 tons of clean fill a year or less, "may not originate from an out-of-state source because of PADEP's limited ability to inspect and evaluate out-of-state source areas." App. 18. Furthermore, the plaintiffs allege that the defendants "stated unequivocally that they were not going to inspect fill material outside of Pennsylvania due to significant staffing shortages," and that they could not approve any projects for which the fill material had not been inspected. Id. 34. Therefore, the plaintiffs argue, "Defendants acknowledged a policy of arbitrarily rejecting out-of-state fill." Pioneer Br. 16.

In September 2008, Pioneer applied to use clean fill from a construction project in New York to reclaim the Laflin Quarry. The plaintiffs identified the construction of a

---

[1] The plaintiffs elsewhere explain that the Waste Bureau has jurisdiction over inactive mines and applies the Waste Standard. Pioneer Br. 12. By contrast, "[t]he Mining Bureau administers the regulatory programs for all mining activities and has jurisdiction over reclamation activities in active and abandoned mines." Id. 11. Although Pioneer does not so specify, we assume based on the other facts alleged that Pioneer's Laflin Quarry is active.

3

new Willis Avenue Bridge, which connects the New York City boroughs of Manhattan and the Bronx, as the source of 4,500 tons of clean fill they wished to place above the water table at Laflin Quarry. The plaintiffs allege that they extensively tested the fill at the Willis Avenue Bridge project (the "WABP") and determined that it was clean under the Waste Standard. However, on November 26, 2008, the plaintiffs received a deficiency letter from the PADEP explaining that the Mining Bureau had developed its own draft standard — the Mining Standard — with which the plaintiffs had failed to comply.

The plaintiffs claim that they were completely unaware of the existence of the Mining Standard because it was never adopted or distributed by the PADEP, but they nevertheless responded to the PADEP letter by addressing the identified deficiencies with the WABP fill. Still, on February 27, 2009, the PADEP denied Pioneer's Source Approval Request because the proposed WABP fill "does not meet the definition of clean fill," as "[s]oil and groundwater at the source site are extensively contaminated with metals and petroleum hydrocarbons," such that "[i]t cannot be proven or determined with any real certainty that the material to be placed on the mining permit is uncontaminated." App. 52. The letter went on to inform Pioneer of its right to appeal that determination to the Environmental Hearing Board (the "EHB").

Pioneer initiated the appeals process with the EHB but moved to discontinue the appeal when it learned that its challenge was moot because the WABP fill had already been moved. Specifically, Pioneer alleges that 110,000 tons of the same WABP fill was permitted to be deposited in a different Pennsylvania mine in Coplay, Pennsylvania. The

4

Coplay Quarry is seventy miles from the Laflin Quarry, and has parts that are both inactive and active. Coplay's request to reclaim the inactive part of the Coplay Quarry with fill from the WABP was governed by the Waste Bureau. The Waste Bureau found that the WABP fill met its standards for "clean fill," and approved Coplay's request.

The plaintiffs allege that, because the Waste Standard and Mining Standard employ the same requirement for clean fill located above the groundwater table, and because the Coplay Quarry and the Laflin Quarry are both above the groundwater table, the same standard for clean fill was applied to the WABP in considering Pioneer's request as was applied to Coplay's request — but with the opposite result. The plaintiffs' constitutional claims arise from the denial of their request to reclaim the Laflin Quarry using the WABP fill, particularly in light of the allegedly disparate treatment afforded Coplay. Realizing that Coplay had capitalized on the WABP opportunity, the plaintiffs submitted applications for disposal of clean fill from other out-of-state sources at Laflin Quarry, but they contend that the PADEP never responded. Accordingly, Pioneer abandoned its plans to reclaim the Laflin Quarry through disposal of fill, and instead reclaimed its mines by a costlier process — the sloping method.

The plaintiffs raised constitutional claims under the Commerce Clause, Equal Protection Clause, and Due Process Clause through their suit under 42 U.S.C. § 1983. The District Court held that the PADEP, a state agency, is immune from suit for damages pursuant to the Eleventh Amendment and has not waived its sovereign immunity. Moreover, the District Court ruled, the individually named PADEP defendants sued in their official capacities (John Hanger, Keith Brady, Thomas Callahan, Nathan Houtz,

5

Michael Menghini, and Michael Kutney), are also immune from suit for damages pursuant to the Eleventh Amendment,[2] and defendant John Hanger was dismissed because he was impermissibly sued under § 1983 on a theory of respondeat superior. The plaintiffs have not challenged these rulings.

The District Court dismissed the rest of the plaintiffs' constitutional claims because it held that the agency defendants in their individual (non-official) capacities are entitled to qualified immunity because the plaintiffs' complaint asserted no violation of a clearly established right (or any right). On dismissing these claims, the District Court declined to exercise supplemental jurisdiction over the plaintiffs' remaining state-law claim. The plaintiffs timely appealed.

## II.

The District Court had jurisdiction over this matter under 28 U.S.C. § 1331 and this Court has jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over the District Court's grant of the defendants' motion to dismiss. Fowler v. UPMC Shadyside, 578 F.3d 203, 206 (3d Cir. 2009). In so doing, "[w]e take as true all the factual allegations of the [complaint] and the reasonable inferences that can be drawn from them, . . . but we disregard legal conclusions and recitals of the elements of a cause of action, supported by mere conclusory statements." Santiago v. Warminster Twp., 629 F.3d 121, 128 (3d Cir. 2010) (quotation marks omitted). "[W]hen the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

---

[2] The District Court held that the defendants in their official capacities are not immune from suit for injunctive relief.

6

liable for the misconduct alleged," the claim has "facial plausibility" and the complaint will survive a defendant's motion to dismiss. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Furthermore, "[w]e review the district court's grant of qualified immunity de novo as it raises a purely legal issue." Burns v. Pa. Dep't of Corr., 642 F.3d 163, 170 (3d Cir. 2011). We review a district court's denial of a motion for leave to amend the complaint for abuse of discretion. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).

III.

A.

The plaintiffs allege that the defendants violated their rights under the Dormant Commerce Clause — that is, the "negative aspect" of the Commerce Clause that "limits the states' power to regulate interstate commerce." Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd. ("Cloverland I"), 298 F.3d 201, 210 (3d Cir. 2002); see also U.S. Const., art. I, § 8, cl. 3. Specifically, the plaintiffs argue that the defendants' Mining Standard violates the Dormant Commerce Clause because it treats clean fill located out of state differently from in-state clean fill. The plaintiffs base this argument on the defendants' denial of Pioneer's application to use the WABP fill at the Laflin Quarry because, the plaintiffs allege, although the defendants "admitted the WABP fill was 'clean,' . . . they denied the Application . . . because they refuse to travel out-of-state to inspect fill sources, and they do not approve sources they cannot inspect." Pioneer Br. 23.

7

The Dormant Commerce Clause is violated when a state "impos[es] restrictions that benefit in-state economic interests at out-of-state interests' expense." Cloverland I, 298 F.3d at 210. "The initial question in a dormant Commerce Clause case is whether the state regulation at issue discriminates against interstate commerce either on its face or in practical effect." Id. (quotation marks omitted). "If so, heightened scrutiny applies." Id. "[I]f not, then [the court] considers whether the law is invalid under the . . . balancing test" promulgated by the Supreme Court in Pike v. Bruce Church, Inc., 397 U.S. 137 (1970). Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd. ("Cloverland II"), 462 F.3d 249, 261 (3d Cir. 2006).

Given this framework, our analysis begins with the question of whether the state regulation at issue — the Mining Standard — discriminates in purpose or effect against interstate commerce. This Court has identified two situations wherein discrimination triggering heightened scrutiny will be found: (1) where the extraterritorial effects of a challenged regulation adversely affect economic production in other states; and (2) where the object of the challenged regulation is "local economic protectionism." Id. at 261-62. In City of Philadelphia v. New Jersey, the Supreme Court deemed discriminatory a New Jersey law that prohibited the importation into New Jersey of waste generated outside of the state, holding that such a prohibition "imposes on out-of-state commercial interests the full burden of conserving the State's remaining landfill space." 437 U.S. 617, 628 (1978). The Court held that even a state's legitimate purpose for enacting a regulation "may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them

8

differently." Id. at 626-27. "What is crucial is the attempt by one State to isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade." Id. at 628.

This Court has acknowledged that, in the context of the Dormant Commerce Clause, "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Lebanon Farms Disposal, Inc. v. Cnty. of Lebanon, 538 F.3d 241, 248 (3d Cir. 2008) (quotation marks omitted). In the instant case, the plaintiffs allege in their Complaint that the "Defendants were not 'comfortable' approving . . . anything that they could not physically inspect," and that the "Defendants stated unequivocally that they were not going to inspect fill material outside of Pennsylvania due to significant staffing shortages." App. 34. Thus the plaintiffs have sufficiently alleged that the Mining Bureau's source fill application process treats out-of-state fill differently from in-state fill because it does not afford out-of-state fill the chance to be approved. That is, they have properly alleged that the Mining Standard treats commerce from outside of Pennsylvania differently for no reason other than the commerce's out-of-state origin.

Once a plaintiff has demonstrated the existence of such discrimination, we apply the heightened scrutiny standard and "the burden then shifts to the state to prove that 'the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means.'" Cloverland II, 462 F.3d at 261 (quoting Maine v. Taylor, 477 U.S. 131, 138 (1986)). Because the defendants point to a legitimate local purpose — namely, the need to have the proposed fill inspected by PADEP officials, who

9

are located in Pennsylvania — we hold that the defendants have satisfied their burden in this case.

B.

The plaintiffs also allege that the defendants violated their rights pursuant to the Equal Protection Clause of the Fourteenth Amendment under three different theories: first, that the plaintiffs were treated differently from other active mine operators; second, that they, as active mine operators, were subject to a more burdensome standard for mine reclamation by fill than operators of inactive mines; and third, that the defendants inconsistently and arbitrarily applied their standards to treat Pioneer and Simpson differently from Coplay, though they are similarly situated.

To state an equal protection claim under such a "class of one" theory, the plaintiffs must allege that they were "intentionally treated differently from others similarly situated by the defendant and that there was no rational basis for such treatment." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008). The District Court held that the plaintiffs failed to make out an equal protection claim because they did not sufficiently allege that Pioneer is similarly situated to any party treated differently. The District Court acknowledged that the plaintiffs claimed that Pioneer is similarly situated both to Coplay, which was permitted to reclaim the Coplay Quarry with WABP fill, and Glenn Hawbaker, Inc., whose reclamation was approved by the Moshannon District Mining Office on the condition that the clean fill used there comply with the less stringent Waste Standard, rather than the Mining Standard that Pioneer was required to follow. App. 20. As to the latter, we agree with the District Court that the plaintiffs' Complaint failed to

10

allege sufficiently that Pioneer is similarly situated to Glenn Hawbaker, Inc., a fact that the plaintiffs acknowledge before this Court on appeal. See Pioneer Br. 45 ("Even if Plaintiffs were not specific or clear enough as to how Pioneer and Glenn Hawbaker are similarly situated, the above discussion demonstrates that they are . . . .").

We also hold that Pioneer has failed to establish that it is similarly situated to Coplay. The District Court lucidly explained that the PADEP recognizes a distinct statutory scheme for the regulation of active versus inactive mines. Moreover, the PADEP has "extensive discretion in enforcing state environmental protection laws," and it is authorized by Pennsylvania statute "to regulate reclamation at active mine sites." App. 345. Pioneer's Laflin Quarry is at least partly an active mine, while the Coplay Quarry is an inactive mine. Accordingly, the District Court held that Pioneer and Coplay are not similarly situated. Even if they were, the District Court explained, a rational basis existed for the PADEP to distinguish between them since the defendants "gave Plaintiffs specific reasons as to why the clean fill at the WABP did not meet the regulatory requirements." Id. We agree, and therefore will affirm the District Court's denial of Pioneer's challenge on equal protection grounds.

C.

We consider, finally, the District Court's dismissal of the plaintiffs' claim that the defendants violated their rights to substantive and procedural due process. We address each in turn.

Pioneer and Simpson allege that the defendants violated their substantive due process rights under both of the "two very different threads" identified by this Court as

11

part of the "fabric of substantive due process . . . woven by our courts" — that is, substantive due process relating to legislative action and substantive due process relating to non-legislative or executive acts. Nicholas v. Pa. State Univ., 227 F.3d 133, 139 (3d Cir. 2000). The District Court held that the plaintiffs cannot make out a claim of violation of their substantive due process rights under the "legislative act" thread because one of the plaintiffs' principal allegations is that the Mining Standard "has never been promulgated pursuant to Pennsylvania's formal rulemaking or policymaking procedures." App. 19. Accordingly, the District Court held, "the allegations in Plaintiffs' Complaint admit that the Mining Clean Fill standard [the Mining Standard] is a non-legislative, executive action." Id. 319. As the plaintiffs point out, however, we have located "the distinction between legislative acts and non-legislative or executive acts" in the fact that "executive acts, such as employment decisions, typically apply to . . . a limited number of persons, while legislative acts, generally laws and broad executive regulations, apply to large segments of society." Nicholas, 227 F.3d at 139 n.1 (quotation marks and alterations omitted). The fact that Pioneer and Simpson challenge the Mining Bureau's ability to promulgate its own standard does not mean that the standard's application, which affects a large segment of society, fails to qualify as a legislative or regulatory act. Indeed, the Mining Standard is applied precisely for the purpose of regulating the way in which a mining company may reclaim its mine.

We hold, nevertheless, that there is no substantive due process violation as to the legislative thread. "[A] legislative act will withstand substantive due process challenge if the government identifies a legitimate state interest that the legislature could rationally

12

conclude was served by the statute." Id. at 139 (quotation marks omitted). In our view, the legitimate state interest supporting the Mining Standard is the PADEP's interest in protecting the environment from contamination due to fill that is not "clean."

As for the other thread of our substantive due process inquiry, "[t]o prevail on a non-legislative substantive due process claim, a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies," which requires a showing that the interest is of a "particular quality" that is "fundamental under the United States Constitution." Id. at 139-40 (quotation marks omitted). Even if the state action complained of here were the kind of "intentional and unjustifiable" interference with "[t]he right to pursue a lawful business or occupation" that this Court has held to be a protected right, Small v. United States, 333 F.2d 702, 704 (3d Cir. 1964), nevertheless the conduct of the defendants is not "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," Kaucher v. Cnty. of Bucks, 455 F.3d 418, 425 (3d Cir. 2006) (quotation marks omitted). This Court has acknowledged in the land-use context that setting a high standard for non-legislative substantive due process violations "prevents us from being cast in the role of a zoning board of appeals." United Artists Theatre Cir., Inc. v. Twp. of Warrington, Pa., 316 F.3d 392, 402 (3d. Cir. 2003) (quotation marks omitted). Specifically, we acknowledged that matters of "local concern" such as land-use decisions "should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper' motives." Id. Accordingly, we will affirm the District Court's finding that because the plaintiffs have not sufficiently alleged

13

that the defendants violated their clearly established substantive due process rights, the defendants are entitled to qualified immunity on this claim.

We further hold that Pioneer has not stated a claim for relief that the defendants violated its procedural due process rights. The plaintiffs allege that the defendants contravened the requirements of procedural due process by failing to give Pioneer notice and opportunity to be heard in advance of the significant deprivations of liberty and property that the defendants allegedly committed. "A procedural due process claim is subject to a two-stage inquiry: (1) whether the plaintiff has a property interest protected by procedural due process, and (2) what procedures constitute due process of law." Schmidt v. Creedon, 639 F.3d 587, 595 (3d Cir. 2011) (quotation marks omitted). Although the Supreme Court "consistently has held that some form of hearing is required before an individual is finally deprived of a property interest," nevertheless the Supreme Court has acknowledged that due process does not always "require[] an evidentiary hearing prior to the deprivation of some type of property interest." Mathews v. Eldridge, 424 U.S. 319, 333 (1976). In order to identify "the specific dictates of due process" in a given context, courts must consider the following three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. at 335.

14

The private interest affected by official action in the instant case is Pioneer's ability to use its surface mining permit to reclaim the Laflin Quarry. However, despite this interest, we hold that the final factor of the Mathews test, the government's interest, weighs against requiring a hearing in every case where an application for clean source fill like Pioneer's was made. Furthermore, the availability of review of the Mining Bureau's determination before the EHB satisfies the requirements of procedural due process. As the District Court correctly pointed out, we have held that "when a state affords a full judicial mechanism with which to challenge the administrative decision in question, the state provides adequate procedural due process." DeBlasio v. Zoning Bd. of Adjustment for Twp. of W. Amwell, 53 F.3d 592, 597 (3d Cir. 1995) (quotation marks omitted), abrogated on other grounds by United Artists, 316 F.3d at 392. Although Pioneer notes that it would not have been able to obtain damages pursuant to the procedures of the EHB, the Supreme Court has held that even where "state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process." Parratt v. Taylor, 451 U.S. 527, 544 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327 (1986). Therefore, we hold that Pioneer has not adequately made out its claim that the defendants violated its procedural due process claim.

## D.

The plaintiffs also seek our review of the District Court's denial of its motion for leave to amend the complaint. A district court does not abuse its discretion when

amendment of the complaint would be futile. In re Burlington Coat Factory, 114 F.3d at 1434. Because we hold that "pleading deficiencies would not have been remedied by proposed amendments" in this case, we will affirm the District Court's denial of the plaintiffs' motion for leave to amend the complaint.. Kanter v. Barella, 489 F.3d 170, 181 (3d Cir. 2007).

IV.

For the foregoing reasons, we will affirm the order of the District Court.